May it please the court, Alan Graf for Appellant Jerry Fernandez. I'd like to reserve two remaining minutes for rebuttal. I'm also a little hard of hearing, so I'll let you know that. Decision of the administrative law judge denying Social Security benefits to my client and war veteran Jerry Fernandez is flawed in many ways, but the overriding flaw in this case is the almost impossible to prove. I don't know if I didn't mean to interrupt you, but the clerk there on the clock doesn't seem to be moving. Oh, you got an extra 30 seconds. Thank you. The overriding flaw in this case is the almost impossible burden of proof imposed by the commissioner on the traumatized veteran to prove disability. A federal agency, I might add, in charge of the mission of protecting its citizens from falling into the web of death, destitution and despair, as stated by the architect, Secretary Arthur Altmaier. There's no dispute that Mr. Fernandez fought for a year and a day in Vietnam, that he served and engaged in heavy combat, that he was there when his fellow soldiers were killed in front of him, that the VA has found them 80 percent disabled as of 3-21-97 due to service-connected PTSD, now raised to 100 percent, and this finding should have been considered in the recent Ninth Circuit holding in McCarty v. often and even frequent deficiencies in concentration such that these limits result in a failure to complete tasks in a timely manner. In fact, this finding was contained in a PRTF attached to the ALJ's written decision. The ALJ found that the veteran had severe limitations in concentration, but did not incorporate the same findings into the body of decision or in his hypothetical to the VA at the hearing. That is another flaw in the ALJ's decision-making process. Limitations of concentration, persistence and pace were based upon the testimony of Dr. Hart, the psychologist who appeared at the hearing, who found that with medication, the veteran had often deficiencies of concentration, and without medication, the limitations became frequent, which are at a listing level of severity. Treating mental health provider Chandler and psychiatrist Dr. Colbeck agreed, at least implicitly, through his assessment of low GAF scores. What does the law tell us? If he could work with medication, but not without it, does he have to take medication? Well, it depends who makes that determination. Under SSR 8259, it has to be the treating source. Social Security can't say to the veteran, because a non-examining physician says you have to take medication, especially a psychologist, then you're required to. Under the 8259, there are a few different requirements. It has to be, one, the treatment has to clearly expect to restore capacity to engage in any gainful activity. It has to be prescribed by a treating source. In this case, particularly the post-hearing letter of Chandler, which was the treating team, PTS team from the Veterans Administration, stated unequivocally that medication was not going to cure the trauma and the flashbacks of PTSD. So Social Security can't say to the veteran, you've got to take medication. And there's also a notice requirement, too, and that wasn't done as well. And so this was the first time at the hearing that the administration took this position, based upon the testimony of the treating psychologist. The primary reason that the LGA rejected the plaintiff's claim was that medication would improve his condition, as the court has noted. And the other problems with this is that, one, it was based upon a psychologist's testimony. Psychologists aren't qualified or particularly licensed to prescribe medication. Two, the psychologist's testimony was retrospective, and that's one of the reasons that the magistrate gave in criticizing Dr. Kovach's opinion and Chandler's, in the magistrate's opinion, not the LGA's opinion. Both of these opinions were retrospective, but so was, again, Dr. Hart's and Dr. Sutherland's, which the magistrate relies upon. And, again, I point out to the court, the LGA really never mentioned. That's one of the other problems that the appellant has with this decision, is that the LGA's decision itself really doesn't explain why it came to those various conclusions and is supplemented by counsel and by the magistrate later, in terms of adding Dr. Sutherland's opinion, a DDS physician, and explaining why Chandler's opinions as a treating source didn't work. Also, the psychologist's opinion that medication would improve the veteran's condition was under cross-examination. The psychologist admitted that medication does not cure PTSD in all cases, and he really couldn't say for sure whether it worked in this case. So, again, this isn't really substantial evidence that the administration can rely upon. There are other problems in this case, and, again, many flaws in the LGA's decision. The only non-exertional limitations found by the LGA was that it was necessary for the veteran group to avoid close contact with the general public and coworkers. And even Dr. Sutherland, who the magistrate relied upon, said he could function with little restriction except when it requires him to be around others. He isolates, is guarded, has a history of fighting, and stays to himself. Those are more severe limitations than just avoiding close contact with the general public and coworkers. Also, the magistrate, again, found that the VE's testimony at the hearing conflicted with the VE's testimony of Richard Ross that was submitted post-hearing. And, in fact, if you look at the evidence presented, both VE's, when it comes down to it, find that, given the LGA's hypothetical, a hypothetical claim it could not sustain employment. Sherry Barna, the VE at the hearing, testified that, given the hypothetical, there could be jobs that he could work at but not sustain at when confronted with the 25 percent reduction in alertness and fatigue limitation. Also, the LGA presented that the individual's result of his war experiences could hardly be civil to Southeast Asians, where it's important in a work-like or work situation. And, in response to this hypothetical, the VE testified she could not guarantee he would not be exposed to Southeast Asians in the jobs proposed, and she did not have statistics as to how many Southeast Asians there would be working in a job in Oregon or Washington. That's a step five burden. This burden is on the commissioner. And if they can't come up with statistics or state unequivocally that he wouldn't, the veteran wouldn't encounter Southeast Asians, then they haven't met their burden. I don't have anything else, and I'll just. Well, are you familiar with the, is there a relationship between a veteran's disability and Social Security disability? Well, there's similar criteria but not exactly the same. And that's why in McCarty, the United Circuit held that, at least because it's another federal agency assessing disability, the ALJ at least should examine that decision and give opinions why or why not the decision should be given any weight. And in this particular case, the ALJ didn't do that. I admit that we didn't raise that issue at the district court. However, the United Circuit hadn't made that decision at that point, and we'd ask that the court should respond to consider that issue. Thank you. We'll now hear from the government. Good morning. Good morning, Your Honors. Jeffrey Baird, representing the Commissioner of Social Security. The VA does have a somewhat different program. In McCarty, the United Circuit did ask our ALJs to give consideration to VA records and even their ratings. In this case, on page 117 of the transcript, we have the VA rating. That's 70 percent. That refers specifically to a loss of income earning potential. The way the VA works, you could even be 100 percent and still could possibly be working. The percentage deals with a possible loss in income. Well, does the VA supplement their income, or does it just provide medical and pharmaceutical and so on? I believe it's both, Your Honor. I believe it's both. Actually, Mr. Graff can answer that. Could they collect from Veterans Administration some income and then go to Social Security and get some more? That's right. That's right. That's right. The interesting thing about the Veterans rating here, though, and again, I refer the Court to page 217 of the transcript, and that's very visible also in the excerpts of record up in the right-hand corner. At the bottom of the page, the Veterans Administration says that employment may be possible with treatment. And that's exactly what Dr. Hart, the medical expert, said during the hearing, as he carefully examined the record and observed the claimant firsthand, his demeanor, and he found that he had great capabilities, that there would be possibilities with treatment. And on that basis, he set some functional limitations. Conceitedly, it's going back some years to September of 97 when his insurance lapsed. We can't pay everything on the grounds of ultimate justice. We have an insurance program that does have those limits. And Dr. Hart, well-credentialed with his Ph.D., 20 years of practice, 30 publications, said, no, this is the kind of case that could be amenable to treatment. And with treatment, there was functional limitations that would permit work. So there's actually a correlation between what the Veterans Administration said with a 70 percent rating and with what Dr. Hart said. Did the ALJ credit what the Ms. Chandler, what the therapist said at the VA? The ALJ carefully reviewed Ms. Chandler's progress notes. That went on for three pages in the ALJ's decision. And he did examine what was going on. Ms. Chandler herself was very speculative. When she wrote in 1999, she said, I'm giving my opinion of where he's at in 1999. He's missed 11 appointments. It's hard for me to say. I can't tell exactly. So she was quite speculative as well. And it was helpful then to have a medical expert go through the whole record with a synoptic view to see what was happening in September 1997. He went to 11 appointments and he missed 11 appointments. That's right. Something like that. He went to 11 and he missed 11. And so Chandler ended up giving somewhat speculative viewpoints. In the later letter that she. I thought that she expressed some real doubt about his ability to work. Yes, she did. That's true. But she also said she couldn't tell exactly. That's on page 277, I believe. How much precision is needed in that? Did the ALJ accept her statements totally or just in part? Just in part. He has to give germane reasons to reject a lay witness. Let me refer to our credentialing program. In our regulations, credentials are favored. A reasonable person might well do that. I think when this court chooses its clerks, you rely heavily on credentials. And most people would, trying to make a decision without actually having the experience of knowing everything. So the credentials do advise how much weight should be given the opinion. What we have with Nurse Chandler is a well-meaning nurse. And as Judge Weinberg below said, with due respect, she doesn't with due respect for her fine efforts, she doesn't have a doctorate. She may not have the level of knowledge of even a psychologist with a PhD. What bothers me is it's not like she's a counselor on some street corner. She's working with the VA. She's part of a team. And I'm sure they have to use a lot of nurse counselors quite frequently. It seems to me some pretty good reasons ought to be given to disregard what she said. Well, I think the ALJ did give reasons. And certainly Judge Weinberg drew some inferences. And I pointed out some inferences available in the record. The substantial evidence came from the medical expert who was not contradicted by all evidence and thus provided substantial evidence in his narrative explanation of what was going on. But Nurse Chandler's opinions were never cosigned by a physician. Now, one might imagine they could have been, but they weren't. And under the Gomez decision, what gives force and power to the treating team is, again, the credentials. It's the credentials of the cosigning physician. But the regulations do not require a certification by a physician of someone who is another source. That's true. But the ALJ can always reject that for merely germane reasons. Fathers me here is vocation. That's what it said. If you factored in the hypothetical, like Miss Chandler said, then he would agree that she couldn't perform any work. True. But the ALJ rejected Nurse Chandler's opinion and relied on the medical expert as substantial evidence. I mean, there may be reasonable minds could differ. And they rely upon the V. And he relied upon the V.E. as well. But the V.E. responded to a hypothetical premised on the limitations set forth by the medical expert. And that was substantial evidence. So much of this case is typical of our cases. It's looking back in time and it's trying to decide hypothetically what someone might be able to do at a certain time. And I urge that the best way to tell is call in a neutral expert, medical expert, an elbow clerk, if you will, to help go through the record and give a synoptic view with a professional's opinion. And that's what happened here. As far as the second vocational expert, the Appeals Council gave it short shrift. I wish they hadn't. I would like reasons always. But under the Gomez decision, they can give it short shrift. The Gomez decision specifically says there's no need for the Appeals Council to comment on vocational evidence arriving after an adverse decision. So and there's a reason for that. It's because after an adverse decision, things that arrive later begin to have the appearance or the possibility of correcting a record or advocacy. So they aren't quite as powerful as the on the spot evidence that comes the first time. So relying on Gomez, that's that's what we asked for. Under the Ramirez decision, does the Appeals Council have to give more analysis to the later opinion of Nurse Chandler? Again, that came in after the ALJ's decision. Well, Ramirez dealt with a physician again, and Nurse Chandler was not even co-signed at that point by a physician. Moreover, her statements didn't address September 30th, 1997. What they addressed was in general, it's difficult to have medicated treatment for post-traumatic stress disorder. That's a very general statement she provides. If there's no questions. It's a difficult problem. We appreciate your argument. Thank you, sir. Mr. Mr. Graff, do you want another minute here? Sure. Thank you very much. The idea that a decision has to a opinion has to be co-signed by a doctor to make it, to give it the weight of a treating source is another insurmountable obstacle. If you're going to give treating weight to a non-physician as part of an interdisciplinary team and then require the opinion to be co-signed, you might as well not even have that, have the interdisciplinary team rule because co-signing is the same thing as signing, and therefore it's the opinion of the treating physician. The last thing is that Chandler did see the plaintiff before the date last insured, and she wrote on her opinion that she saw him. And so her opinion includes the entire time period she saw him, which is before September 1997, the date last insured. So there is evidence from the treating source, from the V.A. team, which specializes in post-traumatic stress disorder, that the claimant was disabled. Thank you very much. We appreciate the argument of both sides. The case will be submitted. We'll now take a 15-minute break.
judges: Lay , Goodwin, Gould